**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                   No. CR 23-0736 JB

CESAR BARBA-VILLEGAS,

       Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on the Defendant's Sentencing Memorandum, filed August 21, 2023 (Doc. 26)("Sentencing Memo."). The Court held a sentencing hearing on August 22, 2023. <u>See</u> Sentencing Minute Sheet at 1, filed August 22, 2023 (Doc. 27). The primary issues before the Court are: (i) whether the Court should accept the Fast-Track Plea Agreement into which Plaintiff United States of America and Defendant Cesar Barba-Villegas entered pursuant to rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure stipulating to a 2-level downward departure pursuant to U.S.S.G. § 5K3.1, <u>see</u> Fast Track Plea Agreement, filed May 24, 2023 (Doc. 19)("Plea Agreement"); (ii) whether the Court should depart downwardly or vary below the Guidelines on the basis of Barba-Villegas' cultural assimilation to the United States; (iii) whether the Court should sentence Barba-Villegas to a low-end Guideline sentence because allegedly similarly situated defendants on average receive low-end sentences; and (iv) what length of imprisonment sentence the Court should impose. The Court concludes: (i) it will not accept the Plea Agreement, because the § 5K3.1 downward departure it provides would produce a Guideline range that is too low, which does not permit the Court to impose a sentence that adequately reflects the 18 U.S.C. § 3553(a) factors; (ii) the Court will not depart downwardly or vary below the

Guidelines on the basis of Barba-Villegas' asserted cultural assimilation; (iii) the Court will not sentence Barba-Villegas to a low-end Guideline sentence because the allegedly similarly situated defendants that receive low-end sentences are disanalogous to Barba-Villegas' circumstances; and (iv) the Court will sentence Barba-Villegas to 16 months' imprisonment.

## **FACTUAL BACKGROUND**

The Court has reviewed the factual findings in the Presentence Investigation Report, filed June 5, 2023 (Doc. 22)("PSR"), the Sentencing Memo.'s factual assertions, and facts asserted at the sentencing hearing, and, there not being any objections to those, the Court adopts them as its own. Barba-Villegas, a twenty-nine-year-old Mexican citizen, is a resident of Santa Fe, New Mexico. See PSR at 2; id. ¶¶ 40, 44, at 11; Sentencing Memo. at 1-2. Barba-Villegas' parents brought Barba-Villegas, then six-months old, with them when they entered the United States without authorization. See PSR ¶ 44, at 11; Sentencing Memo. at 1; Draft Transcript of Hearing at 16:16-21, taken August 22, 2023 (Armijo)("Tr.").[1] Barba-Villegas has five siblings who were born in the United States. See PSR ¶¶ 40, 42-43, at 11; Sentencing Memo. at 1; Tr. at 14:5-15 (Harrison); Tr. at 16:16-21 (Armijo). He grew up in Santa Fe, attending schools there, see PSR ¶ 49, at 11; Sentencing Memo. at 1. In 2013, he married a woman in New Mexico and has a child with her, although the couple divorced that same year. See PSR ¶ 45, at 12; Sentencing Memo. at 1; Tr. at 14:5-15 (Harrison).

Barba-Villegas has a lengthy criminal record, which he first started developing as a juvenile. See PSR ¶¶ 20-30, at 4-8; Tr. at 6:13 (Armijo). His first juvenile adjudication was for burglarizing a car at age fifteen, when he smashed the driver's side window and stole a purse, see

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

PSR ¶ 20, at 4, and he subsequently acquired several similar juvenile adjudications: (i) resisting arrest, along with two dismissed counts of burglarizing a dwelling, age fifteen, see PSR ¶ 21, at 5; (ii) burglarizing a car, stealing several items including a briefcase and CPAP machine, age fifteen, see PSR ¶ 22, at 5; (iii) burglarizing a car, stealing iPod accessories and phone accessories, age sixteen, see PSR ¶ 23, at 6; (iv) possession of burglary tools, possession of marijuana and alcohol by a minor, age sixteen, see PSR ¶ 24, at 6; and (v) stealing a bottle of vodka from an Albertson's store and fleeing, age seventeen, see PSR ¶ 25, at 6.

He then racked up adult convictions until he was deported on April 26, 2012, see PSR ¶ 5, at 3: (i) Burglary (Dwelling House), along with several dismissed burglary, larceny, and damage-to-property counts, age eighteen, when Barba-Villegas "entered three separate dwellings (houses) located in Santa Fe County, New Mexico, with the intent to commit theft," PSR ¶ 26, at 7; (ii) Shoplifting, age eighteen, when Barba-Villegas "stole a Vaporite from a Dollar Market," PSR ¶ 27, at 7; and (iii) Resisting, Evading or Obstructing an Officer, age nineteen, when police tried to arrest Barba-Villegas after learning during a traffic stop he had an outstanding warrant, but "the defendant pulled away and tried to run from the scene[, and when p]olice stopped the defendant, . . . he continued trying to pull away and run," PSR ¶ 28, at 7-8.  After his resisting arrest conviction, the United States deported Barba-Villegas to Mexico on April 26, 2012.  See PSR ¶ 5, at 3.

Barba-Villegas has no family in Mexico and knew no one there until his first deportation. See PSR ¶¶ 44, 48, at 11-12; Sentencing Memo. at 1; Tr. at 14:13-15 (Harrison); Tr. at 16:8-15 (Armijo).  While in Mexico, Barba-Villegas started using and became addicted to heroin, which helped him cope with being in an unfamiliar country.  See PSR ¶ 48, at 12.  He has since reentered illegally the United States and been deported three additional times -- in February, 2013; October,

2013; and June, 2016.  See PSR ¶ 34, at 9.  Two unlawful reentry convictions accompanied these three deportations: (i) Barba-Villegas was convicted on June 3, 2013, of Reentry of a Removed Alien, and the Honorable Martha Vázquez, United States District Judge for the United States District Court for the District of New Mexico, sentenced Barba-Villegas to 130 days' time served, and then the United States deported him to Mexico on October 16, 2013, see PSR ¶ 29, at 8; Sentencing Memo. at 1; Tr. at 6:5-12 (Armijo); Tr. at 12:18-20 (Harrison); and (ii) Barba-Villegas was on convicted on April 25, 2014, of Reentry of a Removed Alien, and Judge Vázquez sentenced him to 24-months imprisonment, and the United States deported him on June 16, 2016, see PSR ¶ 30, at 8; Sentencing Memo. at 1; Tr. at 6:5-12 (Armijo); Tr. at 12:18-20 (Harrison).

The 24-month sentence that Judge Vázquez imposed for the 2014 unlawful reentry conviction was based on the PSR from that time.  The United States Probation Office ("USPO") calculated his adjusted offense level at 24 and, after acceptance of responsibility reductions, his total offense level at 19, see Presentence Investigation Report ¶¶ 15, 17-19, at 4, United States v. Barba-Villegas, No. CR 14-3177 (D.N.M. Nov. 12, 2014)(Vazquez, J.)("2014 PSR"), and his criminal history score as a 12, producing a category V criminal history, see 2014 PSR ¶ 31, at 8. Notably, on top of the base offense level of 8 for his illegal reentry offense, Barba-Villegas received a 16-level increase in his offense level because he was "was previously deported . . . after a conviction for a crime of violence," U.S.S.G. § (b)(1)(A)(iii) (2014)(U.S. Sent'g Comm'n, amended 2016), namely the burglary in which he "entered three separate dwellings (houses) located in Santa Fe County New Mexico with the intent to commit theft," 2014 PSR ¶ 11, at 4. See 2014 PSR ¶ 5, at 3; id. ¶ 27, at 7.  Moreover, Barba-Villegas received at least 1 criminal history point for each of the juvenile adjudications described above, except for the age fifteen resisting arrest adjudication, under either U.S.S.G. § 4A1.1(c) or U.S.S.G. § 4A1.1(b).  See 2014 PSR

¶¶ 21-28, at 4-7.  The 2014 PSR, on these features alone, set Barba-Villegas' Guideline range at 57 months to 71 months.  See 2014 PSR ¶ 58, at 12.  Judge Vázquez sentenced below this range, however, with her 24-month imprisonment sentence.

After the 2016 deportation following his 24-month sentence, Barba-Villegas reentered the United States in April, 2023, see Tr. at 13:24 (Harrison), in order to visit his father who had "beg[un] suffering health problems," Sentencing Memo. at 2.  Barba-Villegas was residing with his parents, see Sentencing Memo. at 2, and "report[s] his usual occupation as a landscaping worker," PSR ¶ 50, at 12.  The United States apprehended Barba-Villegas on April 9, 2023, when a deportation officer running checks on persons in custody at the Santa Fe County Adult Detention Center identified Barba-Villegas as an illegal alien.  See PSR ¶ 5, at 3.  Barba-Villegas was in jail on two sets of pending State charges.  On March 27, 2023, Santa Fe police officers arrested Barba-Villegas and charged him with Trafficking Controlled Substances (Possess with Intent)(Fentanyl Pill Form)(1st Offense), after "a total of 581 fentanyl pills were found in the vehicle" in which Barba-Villegas was arrested, and "the defendant admitted possessing fentanyl, crack cocaine, and methamphetamine . . . [and] also admitted resupplying himself every day with 2,000 to 3,000 fentanyl pills."  PSR ¶ 35, at 9.  See Sentencing Memo. at 2.[2]  Barba-Villegas was then released but arrested again on April 6, 2023, and charged with Aggravated Fleeing a Law Enforcement

_____

[2]Barba-Villegas does not dispute the facts underlying this pending charge, but he notes that the drug offense "was dismissed prior to . . . a finding of probable cause."  Sentencing Memo. at 2.  The fentanyl charge was dismissed on June 13, 2023, after the present, federal case against Barba-Villegas had been commenced on May 24, 2023.  See Notice of Dismissal at 1, State v. Barba-Villegas, No. M-49-FR-202300497 (Santa Fe Cnty. Mag. Ct. June 13, 2023)("Dismissal").  The Dismissal states only that the criminal complaint is "dismiss[ed] without prejudice pending further investigation," Dismissal at 1, and does not state that the complaint was dismissed, for example, for a lack of probable cause.

Officer (Injury), and Aggravated Driving While Under the Influence of Intoxicating Liquor or Any Drug (Bodily Injury)(1st Offense), after the following events:

> [P]olice attempted a traffic stop on the defendant; however, he began running red lights and was driving recklessly. The defendant's driving caused another vehicle to collide with a curb as it was forced off the road. The defendant nearly collided with several other vehicles as well. The defendant then drove into oncoming traffic. The vehicle then crashed into a dirt lot, but then continued to flee from police at a high rate of speed. . . . [When p]olice located and arrested the defendant[, t]he defendant admitted to police he was driver and had used marijuana and fentanyl prior to driving . . . .

PSR ¶ 36, at 9-10.  See Sentencing Memo. at 2.  After this arrest on April 6, 2023, federal authorities apprehended Barba-Villegas on April 9, 2023, while he was in Santa Fe County Adult Detention Center on the pending State charges.  See PSR ¶ 5, at 3.

## PROCEDURAL BACKGROUND

Barba-Villegas pled guilty to illegal reentry offenses and executed a Fast-Track Plea Agreement with the United States.  The Court held a sentencing hearing where it rejected the Plea Agreement as providing for a sentence that was too lenient.  The Court ultimately sentenced Barba-Villegas to 16-months imprisonment.

### 1.    The United States' Information and the Parties' Rule 11(c)(1)(C) Agreement.

The United States arrested Barba Villegas on a criminal complaint and then filed an information charging violations of 8 U.S.C. § 1326(a)-(b), for Reentry of a Removed Alien, on which Barba-Villegas agreed to proceed.  See Information, filed May 24, 2023 (Doc. 16).  See also Criminal Complaint, filed April 24, 2023 (Doc. 1); Waiver of Indictment, filed May 24, 2023 (Doc. 18).  On May 22, 2023, the United States and Barba-Villegas executed the Plea Agreement which calls for a 2-level downward departure pursuant to the District of New Mexico's early disposition program under U.S.S.G. § 5K3.1 and for a downward adjustment for acceptance of

responsibility.  See Plea Agreement ¶ 5(e), at 3-4.  Pursuant to rule 11(c)(1)(C) of the Federal

Rules of Criminal Procedure, the parties agreed to

> a sentence within the resulting sentencing guideline range after the application of adjustments for specific offense characteristics to the Defendant's base offense level as calculated pursuant to USSG § 2L.1.2, minus a downward adjustment for acceptance of responsibility, and minus a two-level downward departure pursuant to USSG § 5K3.1 , with no other reductions, departures or variances to be applied.

PSR ¶ 5(e), at 4.

## 2. The PSR's Offense Level and Criminal History Category Calculations.

The USPO delivered the PSR, and makes the following calculations.  See PSR ¶¶ 10-18,

at 4.  The USPO calculates Barba-Villegas' offense level at 10, but notes that with the 2-level

reduction from the 5K3.1 departure, his total offense level is 8:

> 10. **Base Offense Level:** The guideline for a violation of 8 U.S.C. § 1326(a)(1) and (2) is USSG §2L1.2. The base offense level is 8. USSG §2L1.2(a). **8**
>
> 11. **Specific Offense Characteristics:** If the defendant committed the instant offense after sustaining a conviction for a felony that is an illegal reentry offense, increase by 4 levels. USSG §2L1.2(b)(1)(A). **+4**
>
> 12. **Victim Related Adjustment:** None. **0**
>
> 13. **Adjustment for Role in the Offense:** None. **0**
>
> 14. **Adjustment for Obstruction of Justice:** None. **0**
>
> 15. **Adjusted Offense Level (Subtotal): 12**
>
> 16. **Chapter Four Enhancement:** None. **0**
>
> 17. **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a). **-2**

18.     **Total Offense Level:** The offense level is 10; however, pursuant to Rule 11(c)(1)(C) and USSG §5K3.1, the offense level is reduced by two levels. Therefore, the offense level is 8. **8**

PSR ¶¶ 10-18, at 4.

USPO calculates Barba-Villegas' criminal history points as 5 and his criminal history category as category III.  See PSR ¶¶ 29-32, at 8.  According to U.S.S.G. § 4A1.2(e)(3) -- which provides that no prior sentence will be counted toward a defendant's criminal history score unless imposed in the last fifteen years and exceeding one year and one month -- none of Barba-Villegas' six juvenile adjudications contributes criminal history points.  See PSR ¶¶ 20-25, at 4-7.   Nor do Barba-Villegas' three adult convictions contribute any criminal history points -- the burglary conviction and the shoplifting conviction under U.S.S.G. § 4A1.2(e)(3), and the resisting arrest conviction under U.S.S.G. § 4A1.2(c)(1).   See PSR ¶¶ 26-28, at 7-8.    The only two offenses described above that contribute points to his criminal history score are the two unlawful reentry offenses:  The 2013 unlawful reentry conviction adds 2 criminal history points, under U.S.S.G. § 4A1.1(b), providing 2 points for a prior sentence of imprisonment of at least sixty days but less than one year and one month.  See PSR ¶ 29, at 8.  The 2014 unlawful reentry conviction adds 3 criminal history points under U.S.S.G. § 4A1.1(a), for a prior sentence exceeding one year and one month.  See PSR ¶ 30, at 8.  This total of 5 criminal history points makes Barba-Villegas a category III criminal history defendant, and with his total offense level of 8, the USPO identifies the Zone B range of the Sentencing Table as the appropriate one.  See PSR ¶ 54, at 13.  Accordingly, the PSR calculates his Guideline range as 6-months to 12-months imprisonment.  See PSR ¶ 54, at 13.

### 3.     Barba-Villegas' Sentencing Memo.

The United States did not file a sentencing memorandum, but Barba-Villegas filed his Sentencing Memo, in which he moves the Court to sentence him to the bottom of Guideline range

that the Plea Agreement recommends.  See Sentencing Memo. at 1.  Barba-Villegas urges the Court to accept the Plea Agreement, noting that he has had "no criminal convictions since he was 19 years old [and has] . . . no violent history," Sentencing Memo. at 2, and that Fast-Track Plea Agreements are widely used and uncontroversial in the District of New Mexico.  See Sentencing Memo. at 3.  He highlights that the Plea Agreement does not seek a large departure under § 5K3.1, and that he seeks only a low-end sentence within the PSR's calculated range.  See Sentencing Memo. at 4.  Barba-Villegas urges the Court to weigh his assimilation, given that he grew up in the United States, and he notes that "weighing [his] long-standing assimilation . . . does not require the Court either to depart or to vary from the range to which the parties have agreed . . . [which] is within the Guidelines range."  Sentencing Memo. at 4.  Barba-Villegas argues that the Court has previously granted variances, if not departures, in circumstances like his.  See Sentencing Memo. at 5 (citing United States v. Santibanez-Salais, No. CR 10-0256, 2011 WL 831283, at *3-4 (D.N.M. Feb. 8, 2011)(Browning, J.); United States v. Valdez-Flores, No. CR 11-2367, 2012 WL 2384103, at *9 (D.N.M. June 12, 2012)(Browning, J.); United States v. Luna, No. CR 10-2239, 2011 WL 831177, at *4 (D.N.M. Feb. 7, 2011)(Browning, J.); United States v. Enriquez-Ramirez, No. CR 09-2441, 2009 WL 5220463, at *1 (D.N.M. Dec. 11, 2009)(Browning, J.)).

Barba-Villegas notes that, "[d]espite the similarities that this case bears to those in which the Court found a departure or variance warranted, here Mr. Barba-Villegas asks only for a low-end Guidelines sentence."  Sentencing Memo. at 6 (citing United States v. Luna-Jasso, No. CR 14-3523, 2015 WL 1006390, at *9-12 (D.N.M. Feb. 19, 2015)(Browning, J.)).  That his motivation for illegally reentering the country was his family and cultural ties to America counsels a low-end sentence, he argues.  Sentencing Memo. at 6-7 (citing U.S.S.G. § 2L1.2 cmt. n.8; United States v. Aguirre-Tello, No. CR 01-284, 2006 WL 8444495, at *4 (D.N.M. Feb. 2, 2006)(Vázquez, J.)).

The United States Court of Appeals for the Tenth Circuit, he emphasizes, has held that district courts must consider family circumstances under the "history and characteristics" factor in § 3553(a).  Sentencing Memo. at 7 (quoting United States v. Vargas-Ortega, 736 F. App'x 761, 764 (10th Cir. 2018)).[3]

Lastly, he adduces Judiciary Sentencing Information ("JSIN") data that other defendants in his position -- level 10 total offense level and category III criminal history -- receive on average a sentence "below the Guidelines range."  Sentence Memo. at 7 (emphasis in original).  The PSR notes that, in fiscal years 2017 through 2021, for offense level 10 defendants with category III criminal history, the average and median prison sentences are both 10 months, see PSR ¶ 72, at 15; Barba-Villegas points to more recent JSIN data showing that average and median sentences

---

[3]United States v. Vargas-Ortega is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. [. . .] However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citing In re Citation of Unpublished Opinions/Ords. & Judgments, 151 F.R.D. 470 (10th Cir. 1993)).  The Court finds that United States v. Vargas-Ortega; United States v. Villa-Sarinana, No. 22-2093, 2023 WL 2909063 (10th Cir. April 12, 2023); United States v. Diaz, No. 20-1269, 2022 WL 1043623 (10th Cir. April 7, 2022); United States v. Martinez, 660 F. App'x 659 (10th Cir. 2016); United States v. Velasco-Mares, No. 20-2179, 2021 WL 5895132 (10th Cir. Dec. 14, 2021); United States v. Esparza-Moreno, 507 F. App'x 792 (10th Cir. 2013); United States v. Rocha-Roman, 506 F. App'x 799 (10th Cir. 2013); United States v. Bravo-Sosa, No. 22-2015, 2023 WL 3302868 (10th Cir. May 8, 2023); United States v. Lujan-Lopez, 616 F. App'x 878 (10th Cir. 2015); United States v. Cabrera, 571 F. App'x 713 (10th Cir. 2014); United States v. Macias-Gonzalez, 219 F. App'x 814 (10th Cir. 2007); and United States v. Soto-Lopez, 513 F. App'x 746 (10th Cir. 2013) have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

- 10 -

are even lower, see Sentencing Memo. at 7.  Compared to the 10-month to 16-month Guideline range for level 10 and category III defendants, "the average length of imprisonment imposed was 9 month[s] and the median length of imprisonment was 10 month[s]."  Sentencing Memo. at 7 (quoting Federal Defendants in Selected Cell at 1, filed August 21, 2023 (Doc. 26-2)(emphasis and alterations in Sentencing Memo.)).  Noting that the PSR calculates Barba-Villegas' offense level as 8 when the § 5K3.1 departure is applied, he indicates data that "[i]n keeping with the trend observed with the offense level of 10, JSIN indicates that . . . both the average and median sentence was six months, at the very bottom of the applicable range."  Sentencing Memo. at 7-8 (citing Federal Defendants in Selected Cell at 1, filed August 21, 2023 (Doc. 26-3)).  Moreover, in the past five years, for the "220 defendants [who] have been sentenced in New Mexico under § 2L1.2 with the same Criminal History Category (III) and Sentencing Zone (B) as Mr. Barba-Villegas[,] . . . the average sentence length was three months . . . [and t]he median was also three months."  Sentencing Memo. at 8 (citing Average and Median Sentence Length at 1, filed August 21, 2023 (Doc. 26-4)).  He concludes: "Six months -- the same as the national average -- is thus the closest the Guidelines range allows Mr. Barba-Villegas's sentence to come to satisfying 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'"  Sentencing Memo. at 8 (quoting 18 U.S.C. § 3553(a)(6)).

    **4.**    **The Sentencing Hearing.**

       The Court held a sentencing hearing on August 22, 2023.  See Minutes at 1.  At the hearing, the Court stated it was inclined to reject the Plea Agreement because it pushes the sentence too low for what the Court deemed appropriate.  See Tr. at 3:2-7 (Court).  The Court noted that if it accepts the Plea Agreement and grants the 2-level, § 5K3.1 Fast-Track departure, then the Court would have to give a sentence less than what the defendant has gotten in the past for his 2014

illegal reentry convictions -- the Court noted that "sometimes the Fast-Track program and its operation . . . gives us odd results . . . [and] this is one of them." Tr. at 4:2-3 (Court). Barba-Villegas noted that because the prior, more-severe sentences occurred a long time ago this explained his lower Guidelines range -- i.e., because Barba-Villegas' past illegal conduct is now too old to contribute to his criminal history score under the Guidelines. See Tr. at 5:1-10 (Harrison). The United States stated that Barba-Villegas is not disqualified from the early disposition program, and his criminal history is old, with his most recent convictions almost ten years old. See Tr. at 5:23-6:12 (Armijo). Noting that the Fast-Track Program saves both prosecutorial and judicial resources, the United States emphasized that Barba-Villegas "fall[s] in the program right where he needs to be" and asked the Court to accept the Plea Agreement. Tr. at 7:8-9 (Armijo). The Court expressed concern, however, that Barba-Villegas has "pages and pages of convictions" for which he is not receiving any points, and "he's in federal court because he was picked up on state charges and discovered in jail, so he's not had a law-abiding life in the United States." Tr. at 8:14-9:2 (Court). The Court therefore declined to adopt the Plea Agreement because the Guidelines range it produces would be inappropriate. See Tr. at 9:9-13 (Court).

After the Court indicated it would not accept the Plea Agreement, Barba-Villegas reconfigured the argument in his Sentencing Memo for a low-end Guideline sentence based on cultural assimilation into an argument for a departure or variance on that basis. See Tr. at 14:5-22 (Harrison). Barba-Villegas again pointed to statistics indicating that similarly situated defendants receive low-end Guideline sentences. See Tr. at 11:13-16, 15:14-23 (Harrison). The Court was skeptical that the statistical information was comparable because, notably, they failed to account for the "two identical crimes and the sentences he received" which poorly "fit . . . into the matrix of data" Barba-Villegas adduces, Tr. at 12:6-11 (Court), to which Barba-Villegas responded that

the statistics were comparable because the Guidelines themselves already incorporate and reflect his prior offenses, including his reentry convictions, and reflect a policy choice as to the weight afforded such offenses, see Tr. at 13:1-20 (Harrison).  The United States maintained that a Guidelines sentence is appropriate and opposed the cultural assimilation departure.  See Tr. at 17:20-25 (Armijo).  Although the Court recognized a cultural assimilation departure is authorized, the Court exercised its discretion to not apply it, because Barba-Villegas' "case remains in the heartland of cases that this court has seen and [that] my colleagues here in the District of New Mexico, as well as colleagues across the country" have seen.  Tr. at 19:14-23 (Court).

The Court then adopted the PSR's factual findings and Guideline applications, without the 2-level 5K3.1 departure.  See Tr. at 21:8-14 (Court).  Confirming that Barba-Villegas' offense level of 10 and criminal history category of III gives a Guideline imprisonment range of 10 to 16 months, the Court sentenced Barba-Villegas to 16 months' imprisonment and recommended that removal proceedings begin.  See Tr. at 21:18-25 (Court); id. at 24:1-8 (Court).

## LAW REGARDING THE SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L No. 98-473, 98 Stat. 1837, 1987, thus making the Guidelines sentencing ranges effectively advisory.  543 U.S. at 245.  In excising the two sections, the Supreme Court left the Sentencing Reform Act's remainder intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress directs sentencing courts to impose a sentence "sufficient, but not greater than

necessary," to comply with the four statutorily-defined purposes that 18 U.S.C. § 3553(a)(2) enumerates:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551(a).  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the offense's nature, and the nature of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines sentences are no longer mandatory, both the Supreme Court and the Tenth Circuit clarify that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 35 (2007). The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] 'represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'" United States v. Cage, 451 F.3d at 593 (quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349). A reasonable sentence is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). See United States v. Booker, 543 U.S. at 261-62.

In the Tenth Circuit, "a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d at 1264. This presumption is an appellate presumption, however, and not one that the trial court can or should apply. See Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 350-51 (repeating that the presumption of reasonableness "is an *appellate* court presumption")(emphasis in original). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[4] Guidelines sentence. See

---

[4]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guideline ranges are advisory. Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory [.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from

the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated to apply, however, a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, 2010 WL 3075285, at *2-3 (D.N.M. 2010)(Browning, J.).

>        The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

>        . . .

>        The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. 2014)(Browning, J.)(emphasis in original).

Kimbrough v. United States, 552 U.S. at 90-91; Gall v. United States, 552 U.S. at 46-47; Rita v.

United States, 551 U.S. at 351.

<strong>LAW REGARDING DOWNWARD DEPARTURES</strong>

The General Application Principles of the Guidelines provide the following definitions for

a "departure" and a "downward departure":

> "Departure" means (i) for purposes other than those specified in subdivision (ii), imposition of a sentence outside the applicable guideline range or of a sentence that is otherwise different from the guideline sentence; and (ii) for purposes of § 4A1.3 (Departures Based on Inadequacy of Criminal History Category), assignment of a criminal history category other than the otherwise applicable criminal history category, in order to effect a sentence outside the applicable guideline range. "Depart" means grant a departure.
>
> "Downward departure" means departure that effects a sentence less than a sentence that could be imposed under the applicable guideline range or a sentence that is otherwise less than the guideline sentence. "Depart downward" means grant a downward departure.

U.S.S.G § 1B1.1, Application Note 1(F).  Although this definition is broad, the Tenth Circuit has

specified that a "departure from a guideline sentence is a sentence outside the guideline range but

justified by specific provisions in the guidelines."  United States v. Gantt, 679 F.3d 1240, 1247

(10th Cir. 2012).  See United States v. Barnes, 890 F.3d 910, 920 n.1 (10th Cir. 2018)(noting that

a "downward departure must conform to the Guidelines and give a specific basis for why the

Guidelines do not properly account for the defendant's situation.").[5]  The Guidelines offer many

bases for departure; for example, there are many offense-specific departures found throughout

---

[5]Departures contrast with a variance, which "is based entirely on the sentencing court's discretionary authority as long as the court justifies its sentence based on the § 3553(a) factors." United States v. Barnes, 890 F.3d at 920 n.1. See United States v. Gantt, 679 F.3d at 1247 ("A variance can be imposed without compliance with the rigorous requirements for departures.")(citing United States v. Martinez-Barragan, 545 F.3d 894, 901 (10th Cir. 2008)).

Chapter 2 of the Guidelines; see, e.g., U.S.S.G. § 2D1.1, Application Note 27 (departure considerations in certain drug cases); U.S.S.G. § 2B1.1, Application Note 21(B)-(D)(listing downward departure considerations for theft and fraud crimes); and there are more general bases for a departure found in the policy statements in Chapter 5, see, e.g., U.S.S.G. § 5H1.3 ("Mental and emotional conditions may be relevant in determining whether a departure is warranted"); U.S.S.G. § 5H1.11 ("Military service may be relevant in determining whether a departure is warranted, if the military service . . . is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."). In addition, as noted in the definition above, Chapter 4 of the Guidelines contains rationales for downward departures that are related to a defendant's criminal history. See U.S.S.G. § 4A1.3(b).

The Guidelines "place essentially no limit on the number of potential factors that may warrant a departure." Koon v. United States, 518 U.S. 81, 106 (1996). See United States v. Coleman, 188 F.3d 354, 358 (6th Cir. 1999)(en banc)(stating that there are a "potentially infinite number of factors which may warrant a departure"); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline." Koon v. United States, 518 U.S. at 92. Accord United States v. Lewellen, No. CR 11-1524 JB, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

For example, in United States v. Jim, 877 F. Supp. 2d 1018 (D.N.M. 2012)(Browning, J.), the Court did not grant a defendant's request for a downward departure under U.S.S.G. § 4A1.3(b), where the defendant argued that his criminal history category over-represented the seriousness of his criminal history and the likelihood that he would commit other crimes.  See 877 F. Supp. 2d at 1044-45.  The Court noted that Jim's criminal history included: (i) two DWI convictions; (ii) a conviction for Roadway Laned Traffic; and (iii) Abandonment or Abuse of a Child. See 877 F. Supp. 2d at 1044-45. The Court concluded that a criminal history category of II did not over-represent Jim's criminal history, explaining that Jim's previous convictions involved alcohol and driving, demonstrating a pattern of aberrant use of alcohol also seen in the offense for which he was sentenced -- sexual assault -- as Jim asserted that both he and the victim were intoxicated at the time he assaulted the victim. See 877 F. Supp. 2d at 1022-23, 1044-45.  The Court noted that it "does not take much for a defendant to qualify for a criminal history category of II" and that the Court could not distinguish Jim's criminal history from that of other defendants that the Court regularly sees who also have a criminal history category of II, and thus denied Jim's request for a downward departure under U.S.S.G. § 4A1.3. 877 F. Supp. 2d at 1044-45.

In United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. February 17, 2011)(Browning, J.), the Court denied a defendant's request for a downward departure, under U.S.S.G. § 5H1.11, based upon the defendant's eleven years of military service. See 2011 WL 831279, at *3.  Even though Jager had received exemplary reviews in his performance reports, earning either the highest or second highest ratings possible, during his military career, the Court concluded that his service was not present in an unusual degree or distinguishable from other cases which the Guidelines cover.  United States v. Jager, 2011 WL 831279, at *11.  The Court noted

that in many child pornography cases, such as Jager's, the defendant leads an exemplary life publicly, while engaging in a sordid secret life privately. United States v. Jager, 2011 WL 831279, at *11. Jager's case was thus not distinguishable from other defendants sentenced under the Guidelines. United States v. Jager, 2011 WL 831279, at *11. Additionally, Jager was not in intense combat during his military career, most of his time was spent in the support role of a mechanic. United States v. Jager, 2011 WL 831279, at *11. The Court concluded, thus, that Jager's military service did not distinguish his case from those of many other defendants who commit child pornography, and the Court denied Jager's request for a downward departure. See 2011 WL 831279, at *10-11.

## LAW REGARDING § 5K3.1 DEPARTURES

"The so-called 'fast track' program allows a defendant, upon motion of the government, to obtain up to a four-level downward departure from his offense level in exchange for pleading guilty pursuant to an early disposition program." United States v. Luna-Acosta, 715 F.3d 860, 861 (10th Cir. 2013)(citing U.S.S.G. § 5K3.1). Only if a defendant takes a plea deal is he eligible for a Fast-Track departure. See United States v. Heredia, 768 F.3d 1220, 1237 (9th Cir. 2014)(noting that Fast-Track departures are available to defendants "who quickly plead guilty"). The early disposition program concept arose in border states' United States Attorney's Offices:

> Federal prosecutors in states bordering Mexico first developed these "fast track" programs in the early 1990s to handle the large number of illegal re-entry and other immigration cases they were prosecuting. United States v. Lopez-Macias, 661 F.3d 485, 486 (10th Cir. 2011). These programs received Congressional approval as part of the PROTECT Act, Pub.L. No. 108–21, 117 Stat. 650 (2003), which directed the Sentencing Commission to promulgate a policy statement authorizing downward departures of up to four levels, upon motion of the government, as part of early disposition programs approved by the Attorney General and the United States Attorney. Lopez-Macias, 661 F.3d at 486-87. The Sentencing Commission has since promulgated U.S.S.G. § 5K3.1.

United States v. Luna-Acosta, 715 F.3d at 861 n.2.  Fast-track agreements have received approval from reviewing courts:  no terms of "any fast-track plea agreement . . . have been deemed unconscionable or unconstitutional by any court."  United States v. Alvarez, 834 F. App'x 974, 976 (5th Cir. 2021).

As with their general authority to accept or reject plea agreements, district courts are not required to accept Fast-Track pleas.  See United States v. Sandoval-Enrique, 870 F.3d 1207, 1216 (10th Cir. 2017).  The district court particularly has broad discretion to reject an agreement that represents bargaining as to sentencing, as opposed to bargaining as to charges, the latter of which represents an exercise of executive function.  See United States v. Sandoval-Enrique, 870 F.3d at 1216 ("[T]he district court's discretion is very broad when, as here, the fast-track plea agreement involves a bargain regarding sentencing, rather than a charging decision.").  Cf. United States v. McComb, 519 F.3d 1049, 1053 (10th Cir. 2007)("[T]here are perhaps few arenas where the range of rationally permissible choices is as large as it is in sentencing.").  Dangerousness, for example, is a "valid reason" to reject as too-low a plea agreement, because courts can reject negotiated pleas if not in the public interest.  United States v. Villa-Sarinana, No. 22-2093, 2023 WL 2909063, at *2 (10th Cir. April 12, 2023).  The sentencing court may consider a defendant's "prior illegal entry conviction [both] to support an upward adjustment of his base offense level [under U.S.S.G. § 2L1.2] and to deny [a] 'fast track' departure" under U.S.S.G. § 5K3.1, without impermissibly "double-counting."  United States v. Zamudio-Silva, 810 F. App'x 527, 530 (9th Cir. 2020)(quoting United States v. Holt, 510 F.3d 1007, 1011 (9th Cir. 2007)).

A district court cannot have a "blanket policy of denying . . . fast-track departure[s]." United States v. Rosales-Gonzales, 801 F.3d 1177, 1183-84 (9th Cir. 2015), but neither can it place its thumb on the scale in favor of them:  the court cannot "improperly try[] to convince a defendant

to accept a plea agreement that the government was offering," United States v. Sandoval-Enrique, 870 F.3d at 1217 n.11.  If a defendant pleads guilty, but rejects the United States' Fast-Track deal and the waivers it entails, then a district court cannot refrain from imposing a sentence within the range that would have resulted had the United States moved for a § 5K3.1 departure, solely because the defendant rejected the Fast-Track offer.  See United States v. Cozad, 21 F.4th 1259, 1266 (10th Cir. 2022)(rejecting the rationale that, "if a court sentences the defendant to the same sentence he would have had, had he taken a plea agreement, then there is no compelling reason for any defendant to take the plea offer" quoting United States v. Reina-Rodriguez, 468 F.3d 1147, 1158 (9th Cir. 2006), overruled on other grounds by United States v. Grisel, 488 F.3d 844 (9th Cir. 2007))).  Such an approach violates rule 11(c) of the Federal Rules of Criminal Procedure, because the Court cannot involve itself in the United States and defendant's negotiations, in which "it is the role of the government, not the court, to provide a defendant with 'compelling reasons' for entering into a plea agreement."  United States v. Cozad, 21 F.4th at 1267 (quoting United States v. Reina-Rodriguez, 468 F.3d 1147, 1158 (9th Cir. 2006), overruled on other grounds by United States v. Grisel, 488 F.3d 844 (9th Cir. 2007))).  The court, however, does not "interfere[] with prosecutorial discretion when it inquire[s] into the reasons for the joint recommendation."  United States v. Lopez-Castaneda, No. 20-50201, 2021 WL 5298604, at *1 (9th Cir. Nov. 15, 2021).

When sentencing § 5K3.1 defendants, and other unlawful entry defendants, courts consider a number of factors.  Affirming the role of increasingly harsh punishments in deterring illegal entry, Courts of Appeals have expressed skepticism at empirical evidence purporting to "undermine[] . . . the deterrent value of an increased sentence."  United States v. Rosales-Gonzales, 801 F.3d at 1184.  Cf. United States v. Diaz, No. 20-1269, 2022 WL 1043623, at *4 (10th Cir. April 7, 2022)(affirming the district's court imposition of heightened sentence following the

defendant's "repetitive history of illegal reentries," and the fact that "his previous sentences of imprisonment, including most recently 24 months in federal prison, have not deterred him" (quoting Record on Appeal)), cert. denied, 143 S. Ct. 262 (2022).  Although an illegal alien may not be dangerous, still a district court may properly weigh against the defendant that he has been removed multiple times from the United States and impose an "upper end" Guideline sentence to "deter future criminal activity."  United States v. Rosales-Gonzales, 801 F.3d at 1184.

The district court must consider a defendant's motivations for illegal reentry -- including economic motivations -- as mitigating factors, but the district court need not accept them.  See United States v. Chavez-Morales, 894 F.3d 1206, 1214 (10th Cir. 2018)("[T]he district court . . . satisfied its procedural duty to consider Mr. Chavez-Morales's economic motivation argument and provided reasons for rejecting the argument before imposing an above-Guidelines sentence.").  The "dangerous situation" in an illegal entry defendant's home country does not necessarily "put downward pressure on the sentence."  United States v. Martinez, 660 F. App'x 659, 662 (10th Cir. 2016)(quoting Record on Appeal).

On appeal, a sentence imposed in the Guideline range is presumptively reasonable.  See United States v. Maldonado-Passage, 56 F.4th 830, 842 (10th Cir. 2022).  Defendants must do more than merely show that their preferred, lesser sentence is also reasonable; rather, the district court's sentence must be unreasonable.  See United States v. Villa-Sarinana, 2023 WL 2909063, at *3 ("[T]he purported reasonableness of a hypothetical sentence the district court did not impose says nothing about the reasonableness of the one it did impose.").  An illegal reentry sentence of between 24 and 28 months is not unreasonable.  See United States v. Martinez, 660 F. App'x at 662 (citing United States v. Balbin-Mesa, 643 F.3d 783, 788 (10th Cir. 2011)).  Moreover, a district court in a district that has not instituted a Fast-Track disposition program may vary downward to

give a defendant a sentence he might have received had he been in a Fast-Track district and been eligible for the program. See United States v. Lopez-Macias, 661 F.3d 485, 487 (10th Cir. 2011)("[A] district court in a non-fast-track district has the discretion to vary from a defendant's applicable guideline range based on fast-track sentence disparities."). The Court has varied to impose the sentence resulting, had a defendant qualified for the Fast-Track program, when a prior conviction improperly disqualifies the defendant from the program, but the Court has declined to vary where a defendant declined the Fast-Track offer. Compare United States v. Rodriguez-Romero, No. CR 06-2576, 2008 WL 2323511, at *6 (D.N.M. Jan. 29, 2008)(Browning, J.)("The Court believes that similarly situated defendants would have been eligible for participating in a fast-track plea agreement and that a variance is needed to avoid introducing a disparity among similarly situated defendants."), with United States v. De Leon-Delgado, No. CR 07-1811, 2008 WL 2323513, at *7 (D.N.M. Jan. 18, 2008)(Browning, J.)("[A] sentence at the same level as an individual who accepted the Fast-Track Program is inappropriate because it would fail to recognize any distinction between those who do and do not accept that agreement.").

## LAW REGARDING CULTURAL ASSIMILATION DEPARTURES

District courts must consider cultural assimilation -- a concept which "refers to a defendant's cultural and familial ties to the United States" -- as part of a defendant's history and characteristics to apply a variance under 18 U.S.C. § 3553(a)(1), United States v. Velasco-Mares, No. 20-2179, 2021 WL 5895132, at *1 n.1 (10th Cir. Dec. 14, 2021), and, when sentencing illegal reentry defendants, courts also may depart downwardly under the Guidelines pursuant to Application Note 8 to Guideline § 2L1.2. An amendment to the Guidelines made effective in 2010, see Amendment 740, U.S. Sent'g Comm'n, https://www.ussc.gov/ guidelines/amendment/740 (last accessed Oct. 10, 2023), the application note provides that

"[t]here may be cases in which a downward departure may be appropriate on the basis of cultural assimilation," but it advises:

> Such a departure should be considered only in cases where (A) the defendant formed cultural ties primarily with the United States from having resided continuously in the United States from childhood, (B) those cultural ties provided the primary motivation for the defendant's illegal reentry or continued presence in the United States, and (C) such a departure is not likely to increase the risk to the public from further crimes of the defendant.
>
> In determining whether such a departure is appropriate, the court should consider, among other things, (1) the age in childhood at which the defendant began residing continuously in the United States, (2) whether and for how long the defendant attended school in the United States, (3) the duration of the defendant's continued residence in the United States, (4) the duration of the defendant's presence outside the United States, (5) the nature and extent of the defendant's familial and cultural ties inside the United States, and the nature and extent of such ties outside the United States, (6) the seriousness of the defendant's criminal history, and (7) whether the defendant engaged in additional criminal activity after illegally reentering the United States.

U.S.S.G. § 2L1.2 cmt. n.8.  A district court has the jurisdiction to grant a cultural assimilation departure and the discretion whether to do so.  See United States v. Esparza-Moreno, 507 F. App'x 792, 796 (10th Cir. 2013)("In this case, the district court did not conclude that it lacked authority to depart downward on the general grounds of cultural assimilation. Instead, it concluded that a downward departure for cultural assimilation was not warranted in Esparza's case.").  The Tenth Circuit has rejected the proposition that unlawful reentry, particularly by persons with prior convictions, is not concerning:

> [T]he crime of illegal reentry by ex-felons into this country is a serious crime for which Congress has imposed a statutory maximum sentence of twenty years when the prior conviction is for an aggravated felony, see 8 U.S.C. § 1326(b)(2), and [the Tenth Circuit has] previously rejected the argument illegal reentry of an ex-felon is a non-injurious offense warranting a reduced sentence.

United States v. Rocha-Roman, 506 F. App'x 799, 803 (10th Cir. 2013)(citing United States v. Martinez-Barragan, 545 F.3d 894, 905 (10th Cir. 2008)).

A defendant's prior criminal history can be the most important factor in determining whether to apply the departure. A "[d]efendant's lengthy criminal record [may] mitigate[] any reason for a downward departure for cultural assimilation under § 2L.1.2 comment 8, which contrasts cultural ties against a risk of further crimes by a defendant." United States v. Bravo-Sosa, No. 22-2015, 2023 WL 3302868, at *3 (10th Cir. May 8, 2023). Moreover, where a cultural assimilation departure is appropriate, "the issue of cultural ties must still be weighed against the other § 3553(a) factors, including 'the need for the sentence to reflect the seriousness of the crime and promote respect for the law.'" United States v. Rocha-Roman, 506 F. App'x at 803 (quoting United States v. Galarza-Payan, 441 F.3d 885, 890 (10th Cir. 2006)).

The district court has discretion to determine the weight afforded to cultural assimilation. See United States v. Galarza-Payan, 441 F.3d at 889-90 (holding that a 57-month sentence for illegal reentry substantively is reasonable and rejecting effort to rebut presumption of reasonableness based on evidence of cultural assimilation); Alvarez-Bernabe, 626 F.3d 1161, 1167 (10th Cir. 2010)(holding that a 57-month sentence for illegal reentry was substantively reasonable). Thus, a defendant may have "[become] assimilated to living in the United States in the sense that he lived in this country between the ages of 10 and 21 and attended school here for several years," but if he began "having regular interactions with law enforcement at age 15" then a court may find that "he did not assimilate well to the laws of the United States." United States v. Lujan-Lopez, 616 F. App'x 878, 882 (10th Cir. 2015). Such a defendant's "history in the United States was marred by a continual pattern of illegal activity beginning at age 15." United States v. Lujan-Lopez, 616 F. App'x at 882 (10th Cir. 2015). See United States v. Cabrera, 571 F. App'x 713, 717 (10th Cir. 2014)("[S]pending 8 years, 11 months, and 10 days in custody in various state and federal prison really doesn't reflect a history of assimilation." (quoting Record on Appeal)).

The Court's cases presaged the 2010 promulgation of Application Note 8 in granting <u>Koon v. United States</u>, 518 U.S. 81, departures and § 3553(a) variances on the basis of a reentry defendant's cultural assimilation to the United States.   <u>See</u>, <u>e.g.</u>, <u>United States v. Enriquez-Ramirez</u>, 2009 WL 5220463, at *2 ("[T]he Court . . . [considers] the amount of time that Enriquez-Ramirez has spent in the United States and his strong family ties . . . as factors in deciding whether a variance is appropriate."); <u>United States v. Sorto</u>, No. CR 07-0158, 2008 WL 4104121, at *6 (D.N.M. May 5, 2008)(Browning, J.)("[T]he Guidelines authorize a departure for defendants who have family ties and responsibilities, for lesser harms, and for cultural assimilation.").   But recalling that departures are warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline," <u>Koon v. United States</u>, 518 U.S. at 92, the Court has granted cultural assimilation departures only sometimes.   In <u>United States v. Hernandez-Del Villar</u>, 785 F. Supp. 2d 986, 988 (D.N.M. 2011)(Browning, J.)("<u>Hernandez-Del Villar</u>"), the Court declined to depart downward when the defendant came to the United States when he was fifteen, and when he had two teenage children and two grandchildren in the United States.   The Court reasoned that, while a downward departure is authorized, the defendant's circumstances did not "take him outside the heartland of cases that" the Court sees on a regular basis, especially because the defendant "came to the United States when he was fifteen, and his parents did not bring him here." <u>Hernandez-Del Villar</u>, 785 F. Supp. 2d at 988.   In contrast, the Court granted a downward departure in <u>United States v. Ochoa-Arrieta</u>, No. CR 11-2149 JB, 2012 WL 1596939 (D.N.M. April 23, 2012)(Browning, J.), when the defendants' mother brought him to the United States when he was three, he attended public school in the United States for eleven years, English was his primary language, and all of his close family lived in the United States.   <u>See</u> 2012 WL 1596939, at *4.

## ANALYSIS

The Court reaches the following conclusions: (i) the Court will not accept the parties' Plea Agreement providing a 2-level downward departure pursuant to § 5K3.1, because the Plea Agreement does not permit the Court to impose a sentence that fulfills the functions of sentencing as 18 U.S.C. § 3553(a)'s factors provide; (ii) the Court will not downwardly depart or vary below the PSR's formulated Guidelines range on the basis of Barba-Villegas' cultural assimilation to the United States, because his circumstances do not remove him from § 2L1.2's heartland; and (iii) the Court will not impose a low-end Guideline sentence on the basis of data allegedly showing that similarly situated defendants receive low-end sentences, because the data does not represent defendants truly analogous to Barba-Villegas' position, given the length of his prior illegal reentry sentence. The Court will impose on Barba-Villegas a 16-month sentence because that sentence satisfies § 3553(a)'s factors.

## I.     THE COURT WILL NOT ACCEPT THE PARTIES' PLEA AGREEMENT BECAUSE IT PREVENTS THE COURT FROM IMPOSING A SENTENCE THAT ADEQUATELY REFLECTS 18 U.S.C. § 3553(a)'S FACTORS.

The Court does not accept the Plea Agreement, because the Plea Agreement does not permit the Court to impose a sentence that adequately reflects § 3553(a)'s factors. "Because sentencing is within the exclusive purview of the district court, the court has a wide range of discretion to either accept or reject sentence bargains, as contemplated by Rule 11(c)(1)(B) and (C)." United States v. Macias-Gonzalez, 219 F. App'x 814, 817 (10th Cir. 2007)(citing United States v. Robertson, 45 F.3d 1423, 1437 (10th Cir. 1995)("While Rule 11 vests district courts with the discretion to accept or reject plea agreements, the rule does not define the criteria to be applied in doing so. On the contrary, so long as district courts exercise sound judicial discretion in rejecting a tendered plea, Rule 11 is not violated." (citation omitted))). Rule 11(c)(3)(A) gives the Court

the authority to reject plea agreements that are made pursuant to rule 11(c)(1)(C).  See Fed. R. Crim. P. 11(c)(3)(A) ("To the extent the plea agreement is of the type specified in Rule 11(c)(1)(A) or (C), the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report.").  "'Rule 11(c)(1)(C) permits the defendant and the prosecutor to agree that a specific sentence is appropriate, but that agreement does not discharge the district court's independent obligation to exercise its discretion,' which includes the court's obligation to examine the sentence's sufficiency in light of 18 U.S.C. § 3553(a)."  United States v. LaPoint, 16 F. Supp. 3d 1006, 1008-09 (N.D. Iowa 2014)(Bennett, J.)(quoting Freeman v. United States, 564 U.S. 522,  529 (2011)).  The same principle applies to the Court's authority over Fast-Track plea agreements: "[T]he district court's discretion is very broad when . . . the fast-track plea agreement involves a bargain regarding sentencing, rather than a charging decision."  United States v. Sandoval-Enrique, 870 F.3d at 1216.

The Court concludes that the Plea Agreement does not adequately reflect at least some of § 3553(a)'s sentencing factors, specifically the need "to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense[, and] to afford adequate deterrence."  18 U.S.C. 3553(a)(2)(A)-(B).  The crux of the problem with Barba-Villegas' Fast-Track Agreement is that, were the Court to accept the rule 11(c)(1)(C) agreement and apply the requested 2-level § 5K3.1 departure, then the Court would have to impose a sentence significantly lower than the 24-month sentence that Judge Vázquez imposed on Barba-Villegas in 2014 for unlawful reentry.  See PSR ¶ 30, at 8.  Even without the 2-level 5K3.1 departure, Barba-Villegas' range is less than Judge Vázquez' sentence, at 10 months to 16 months.  See U.S.S.G. § 5A.  Applying the requested 2-level departure produces a level 8 offense level, which, when

combined with Barba-Villegas' category III criminal history, gives a range of 6 to 12 months' imprisonment -- at most, half the 2014 sentence.

Besides the Fast-Track Plea Agreement, two other forces cause the Plea Agreement's Guideline range to be so much lower than Judge Vargas' 2014 sentence for illegal reentry: (i) changes in how the Guidelines treat illegal reentry defendants; and (ii) the age of Barba-Villegas' convictions.  Since Barba-Villegas' 2014 unlawful reentry conviction and sentence, § 2L1.2 on illegal entries was "completely rewr[itten]."  Roger W. Haines, Jr., Frank O. Bowman, III & J. Douglas Wilson, Federal Sentencing Guidelines Handbook: Text and Analysis 2021-2022 Edition 1024 (2021)("Guidelines Handbook").  Under the Guideline that was in place for Barba-Villegas' 2014 conviction, § 2L1.2 added a 16-level increase if an illegal reentry defendant had a "conviction for a felony that is . . . a crime of violence . . . [that] receives criminal history points under Chapter Four." U.S.S.G. § 2L1.2(b)(1)(A)(ii) (2014)(U.S. Sent'g Comm'n, amended 2016). On November 1, 2016, Amendment 802 "replace[d] the 'crime of violence' model for enhancements for prior convictions with a 'sentence imposed' model . . . [where] increases depend on the length of the prior sentence, not the type of offense."  Haines et al., Guidelines Handbook, at 1024.   See  Amendment  802,  U.S.  Sent'g  Comm'n, https://www.ussc.gov/guidelines/amendment/802 (last visited October 12, 2023).  Barba-Villegas was sentenced under the old model: On top of the base offense level of 8, he received a 16-point increase for a prior "crime of violence" conviction, based on his 2012 home burglary.  2014 PSR ¶ 11, at 4; id. ¶ 5, at 3; id. ¶ 27, at 7.  Now, the only specific offense characteristic applicable to Barba-Villegas is § 2L1.2(b)(1)(A), which applies a 4-level increase for illegal reentry after sustaining a felony that is an illegal reentry offense.  See PSR ¶11, at 4.  Based on the older

Guidelines, Barba-Villegas' adjusted offense level was much higher than the present one -- 24 offense level in 2014, see 2014 PSR ¶ 15, at 4, compared to only 12 now, see PSR ¶ 15, at 4.

In addition to the higher offense level under the old Guidelines, Barba-Villegas now has a lower criminal history score, not because of amendments to the criminal history Guidelines, but because of his convictions' age. As discussed above, Barba-Villegas has a significant criminal history from juvenile adjudications and adult convictions before 2012. See PSR ¶¶ 20-30, at 4-8. The only offenses that contribute criminal history points now are his 2013 and 2014 illegal reentry convictions, because his juvenile adjudications and pre-2012 convictions are too old under U.S.S.G. § 4A1.2(e)(3) to contribute points. See PSR ¶¶ 20-30, at 4-8. Accordingly, he only has a criminal history score of 5 and a category of III. See PSR ¶ 32, at 8. For his 2014 conviction, the USPO calculated his criminal history score at 12, and his category at V. See 2014 PSR ¶ 31, at 8; id. ¶¶ 21-28, at 4-7.

The present, diminished criminal history tabulation, therefore, combines with the present, diminished offense level to make the sentencing range much lower than that facing Judge Vázquez when she sentenced Barba-Villegas in 2014. Applying the 2-level § 5K3.1 departure that the Plea Agreement provides -- and that "binds the court," Fed. R. Crim. P. 11(c)(1)(C), if the Court accepts the Plea Agreement -- pushes the sentencing range down further, to 6 to 12 months, at most half the sentence Judge Vázquez imposed. See PSR ¶ 54, at 6. Such a sentence does not satisfy 18 U.S.C. § 3553(a)'s mandate that federal criminal sentencing "reflect the seriousness of the offense, . . . promote respect for the law, . . . provide just punishment for the offense[, and] . . . afford adequate deterrence." Although the Court emphasizes that it does not punish Barba-Villegas for having benefited from changes to the illegal reentry Guidelines or from the normal operation of the criminal history Guidelines, the Court will reject the Plea Agreement.

The Plea Agreement is not in the public interest.  Cf. United States v. Carrigan, 778 F.2d 1454, 1462 (10th Cir. 1985)(explaining that Federal Rule of Criminal Procedure governing plea agreements "contemplates the rejection of a negotiated plea when the district court believes that bargain is too lenient[] or otherwise not in the public interest" (quoting United States v. Miller, 722 F.2d 562, 563 (9th Cir. 1983))).  Barba-Villegas' prior reentry conviction and recent, dangerous, allegedly criminal conduct counsel against accepting it.  See United States v. Zamudio-Silva, 810 F. App'x at 530-31 ("[A] prior illegal entry conviction [can] support . . . deny[ing a] 'fast track' departure under U.S.S.G. § 5K3.1.");  United States v. Villa-Sarinana, 2023 WL 2909063, at *2 (describing district court's rejection of plea agreement because of defendant's dangerousness as a "valid reason" to reject the plea agreement).  Barba-Villegas had two recent arrests in quick succession:  (i) for having "a total of 581 fentanyl pills . . . in [his] vehicle," and where he admitted to "possessing fentanyl, crack cocaine, and methamphetamine . . . [and] also admit[ed to] resupplying himself every day with 2,000 to 3,000 fentanyl pills," PSR ¶ 35, at 9; and (ii) for leading police on a high-speed car chase, during which Barba-Villegas "drove into oncoming traffic" to avoid capture, and when captured, admitted to being intoxicated with marijuana and fentanyl, PSR ¶ 36, at 9-10.  Barba-Villegas characterizes himself as having "no violent history at all," Sentencing Memo. at 2, but this proposition is misleading, because of his multiple burglaries as a juvenile, and because of his recent aggravated flight charge; moreover, in terms of opprobriousness, the line between violent crime and the distribution of so deadly a narcotic as fentanyl is not so great.  Compare Homicide Mortality by State, Ctrs. for Disease Control,   https://www.cdc.gov/nchs/pressroom/sosmap/homicide_mortality/homicide.htm#print (last accessed Oct. 16, 2023)(reporting that 306 homicides occurred in New Mexico in 2021), with Program Evaluation Unit, N.M. Legis. Fin. Comm., Progress Report: Addressing Substance Use

Disorders 3 (2023)(reporting that "[i]n 2021, 574 New Mexicans died from an overdose involving fentanyl").  Given the Court's wide discretion to accept or reject the Plea Agreement, it will reject it in part based on Barba-Villegas' dangerous, criminal conduct.  Cf. United States v. Sandoval-Enrique, 870 F.3d at 1216 ("[T]he district court's discretion is very broad when . . . the fast-track plea agreement involves a bargain regarding sentencing . . . .").

The Court will therefore reject the parties' Fast-Track Agreement to avoid the "odd result[]," Tr. at 4:2-3 (Court), it produces in Barba-Villegas' case.  It is the Court's experience that the United States Attorney's Office, because of the volume of illegal entry cases in this border district, hands out pre-indictment Fast-Track Plea Agreements very liberally, and then uses two post-plea backstops to screen out absurd or bad results.  First, it appears that early disposition plea agreements often are handed out with no or little advanced screening, although Fast-Track Plea Agreements, such as Barba-Villegas', feature a lot of ways that the United States can get out of them.  If it is later discovered, before sentencing, that the illegal reentry defendant has certain particularly serious criminal convictions, then the United States can withdraw from its commitment to recommend a § 5K3.1 downward departure:

> Unless the defendant previously has been convicted of murder, a forcible sex offense, or a child sex offense involving physical contact, as defined by and determined to be a disqualifying conviction in the sole discretion of the Government, or has a Criminal History Category of VI, the Government agrees, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), to a two-level downward departure/adjustment pursuant to USSG § 5K3.1 to determine the defendant's Final Adjusted Offense Level.  The defendant's Adjusted Offense Level will be the sum of Base Offense Level 8 plus the USSG § 2L1.2 sentencing guideline adjustments for specific offense characteristics as determined by the sentencing court.  The parties agree, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), to a sentence within the resulting sentencing guideline range after the application of adjustments for specific offense characteristics to the defendant's base offense level as calculated pursuant to USSG § 2L.1.2, minus a downward adjustment for acceptance of responsibility, and minus a two-level downward departure pursuant to USSG § 5K3.1, with no other reductions, departures or variances to be applied.

Plea Agreement ¶ 5(e), at 3.  The fact that this clause is in the Plea Agreement suggests that there may not be a lot of pre-offer and pre-indictment screening.  This safety-valve approach pushes to the backend at least some screening function, and, moreover, screens out only the very worst offenders -- murderers, rapists, child sex offenders.

Second, the Court thinks that the United States Attorney's Office relies on the trial court to screen out some plea agreements that produce untoward results.  District courts shoulder much of the burden in making an individualized assessment of the propriety of these agreements -- rejecting them for illegal reentry defendants who, although not explicitly ineligible for the program, ought not, for one reason or another, enjoy the added leniency a Fast-Track departure provides.  The sentencing court offers a backstop to prevent the "odd results," Tr. at 4:2-3 (Court), that the Fast-Track program can produce.  The Court engages in that function here -- partaking in an individualized inquiry and rejecting a Fast-Track 2-level departure that would produce a sentence inappropriate for this particular offender and this particular offense.

It would not serve the § 3553(a) factors -- particularly respect for the law, just punishment and deterrence -- to impose on Barba-Villegas a sentence significantly lower than the one he received earlier for the same crime.  A heightened sentence is an attempt to deter illegal reentry. Cf. United States v. Corchado-Aguirre, No. CR 15-0393 JB, 2015 WL 10383207, at *18 (D.N.M. Aug. 31, 2015)(Browning, J.)("Even if a severe sentence is less of a deterrent than the certainty of being caught -- a proposition with which the Court agrees -- the sentence's severity still carries some deterrent value.").  The Court will not encourage illegal reentry offenders to wait and to try again later when conditions are more favorable.

## II.   THE COURT WILL NOT, BECAUSE OF BARBA-VILLEGAS' CULTURAL ASSIMILATION, DEPART DOWNWARDLY, VARY BELOW THE

**GUIDELINES, OR SENTENCE BARBA-VILLEGAS TO A SENTENCE AT THE LOW-END OF HIS GUIDELINE RANGE.**

The Court will not depart downward or vary below the Guideline range on the basis of Barba-Villegas' cultural assimilation to the United States. Barba-Villegas' circumstances do not meet the criteria necessary for § 2L1.2 Application Note 8's cultural assimilation departure, and the factors guiding the Court's exercise of discretion also counsel against the departure's application to Barba-Villegas. For the same reasons that the Court will not apply the Guideline departure, the Court also will not vary below the Guidelines. Recalling that a departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline," the Court concludes that Barba-Villegas' circumstances present a heartland case. Koon v. United States, 518 U.S. at 92. Beside the cultural assimilation principle applicable specifically to § 2L1.2 sentences, the Court takes heed of the general principle that "[i]n sentencing a defendant convicted of an offense . . . family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6. Barba-Villegas' circumstances do not "take him outside of the heartland of cases that this Court, this District, the border districts, and the federal courts in general see on a regular basis." Hernandez-Del Villar, 785 F. Supp. 2d at 989.

The cultural assimilation departure is inappropriate. Barba-Villegas' situation does not satisfy the departure's three necessary elements:

> (A) the defendant formed cultural ties primarily with the United States from having resided continuously in the United States from childhood, (B) those cultural ties provided the primary motivation for the defendant's illegal reentry . . ., and (C) such a departure is not likely to increase the risk to the public from further crimes . . . .

U.S.S.G. § 2L1.2 cmt. n.8. Barba-Villegas' parents brought him with them to the United States when he was six-months old; he grew up in Santa Fe, and attended school there until his senior

year of high school when he was deported to Mexico, where he has no family; and he has a child in the United States with a woman to whom he was married.  See PSR ¶¶ 40-45, 49, at 11-12.  These facts satisfy the first element -- "cultural ties" -- because all Barba-Villegas' ties developed from having lived continuously in the United States from infancy until he was first deported in 2012 at age eighteen.  He has not lived "continuously" in the United States since he was first deported: He lived in Mexico from June, 2016, when he was last deported, see PSR ¶ 34, at 9, until April, 2023, when he reentered the United States, see Tr. at 13:24 (Harrison).  But his formative acculturation occurred within the United States -- until the United States removed him from the country, he was "just as American as other young children who have grown up in the United States."  United States v. Santibanez-Salais, 2011 WL 831283, at *2-3.  It is incorrect to rely on the break in the continuity of his presence when he was in Mexico after having been deported as a basis for saying that he does satisfy the "cultural ties" element because he has not "resided continuously in the United States from childhood."  U.S.S.G. § 2L1.2 cmt. n.8.  Although Barba-Villegas has, by now, likely formed some cultural ties with Mexico from having lived there since his 2016 deportation, there is no contention that his primary ties are not still with the United States, given that all his immediate family and his child reside there.  See PSR ¶¶ 43, 45, at 11-12.  Moreover, the "cultural ties" requirement looks to the acculturation an illegal reentry defendant experienced in the defendant's early, formative years.  Had Barba-Villegas lived in Mexico for a longer period of time -- for example, were he to illegally reenter the country again as a middle-aged man -- he likely could not rely on the time he spent in the United States as a young person to claim the cultural assimilation departure; but the seven years he spent in Mexico do not negate the proposition that Barba-Villegas' "cultural ties [are] primarily with the United States," which he "formed . . . from having resided continuously in the United States from childhood" until age

eighteen.  U.S.S.G. § 2L1.2 cmt. n.8.  Accordingly, Barba-Villegas satisfies the first, "cultural ties" prong of the cultural assimilation departure.

Barba-Villegas does not satisfy the second or third prongs of the departure, however.  As to the second, it is not clear that the "primary motivation" for his unlawful return to the United States were his cultural ties to it.  U.S.S.G. § 2L1.2 cmt. n.8.  He asserts that his purpose was to visit family who reside in the United States, including his child and his father who had "recently . . . beg[un] suffering health problems."  Sentencing Memo. at 2.  Yet Barba-Villegas, arrested with more than 500 fentanyl pills in his possession, may well have reentered the United States with criminal or at least economic motives.  See PSR ¶ 35, at 9.  Cf. United States v. Chavez-Morales, 894 F.3d at 1214 (10th Cir. 2018)("[W]here Mr. Chavez-Morales argued that economic incentives in the United States motivated him to commit his illegal reentry offense and that these incentives lessened the seriousness of his offense, the district court needed to address the argument before imposing an above-Guidelines sentence.").  Barba-Villegas also has involved himself recently in criminal activities, so a departure is "likely to increase the risk to the public," U.S.S.G. § 2L1.2 cmt. n.8.  Although Barba-Villegas will be deported after serving his prison sentence, the reduction in his Guidelines range that a cultural assimilation departure yields could still endanger the United States public.

The factors the cultural assimilation departure provide to guide the exercise of the Court's discretion also counsel against granting the departure.  Application Note 8 advises that courts, in determining whether a cultural assimilation departure is appropriate, consider the following:

> (1) the age in childhood at which the defendant began residing continuously in the United States, (2) whether and for how long the defendant attended school in the United States, (3) the duration of the defendant's continued residence in the United States, (4) the duration of the defendant's presence outside the United States, (5) the nature and extent of the defendant's familial and cultural ties inside the United States, and the nature and extent of such ties outside the United States, (6) the

seriousness of the defendant's criminal history, and (7) whether the defendant engaged in additional criminal activity after illegally reentering the United States.

U.S.S.G. § 2L1.2 cmt. n.8.  Factors (1), (2), (3), and (5) cut in Barba-Villegas' favor:  He arrived in the United States with his parents at six months old, see PSR ¶ 44, at 11; he attended school in Santa Fe through high school, see PSR ¶ 49, at 12; he resided in the United States from 1994 until his first deportation in April, 2012, see PSR ¶ 5, at 3, ¶ 44, at 11; and all of Barba-Villegas' family is in the United States, see PSR ¶ 43, at 11.  Factors (4), (6), and (7) cut against him: Barba-Villegas has now lived outside the United States, in Mexico, for a number of years between his most recent deportation on June 16, 2016, see PSR ¶ 34, at 9, and his April, 2023, reentry into the United States, see Tr. at 13:24 (Harrison); he has a substantial criminal history, with several juvenile and adult convictions, and recent run-ins with the law during which federal authorities identified him, see PSR ¶ 5, at 3, ¶¶ 35-36, at 9-10; and he may have engaged in criminal activity, namely his recent drug and resisting arrest offenses, after illegally reentering the United States, see PSR ¶¶ 35-36, at 9-10.

The criminal conduct factors especially counsel against Barba-Villegas' receiving the cultural assimilation departure.  As discussed above, the two criminal conduct related factors -- the scope of the defendant's criminal history and whether the defendant committed crimes after returning to the United States -- can prove decisive even if an illegal reentry defendant scores well on the other Application Note 8 factors.  Cf. United States v. Bravo-Sosa, 2023 WL 3302868 ("[A d]efendant's lengthy criminal record [may] mitigate[] any reason for a downward departure for cultural assimilation under § 2L.1.2 comment 8, which contrasts cultural ties against a risk of further crimes by a defendant."); United States v. Lujan-Lopez, 616 F. App'x at 882 ("Mr. Lujan-Lopez became assimilated to living in the United States in the sense that he lived in this country between the ages of 10 and 21 and attended school here for several years. However, he did not

assimilate well to the laws of the United States.").  Barba-Villegas occupies this position; he has

had a history of unlawful conduct in the past, and recent run-ins with the law also counsel against

granting the departure.  Within days of each other, Barba-Villegas picked up two significant

charges.  On March 27, 2023, he was arrested with "581 fentanyl pills" in his vehicle, and admitted

to "possessing fentanyl, crack cocaine, and methamphetamine[, and to] resupplying himself every

day with 2,000 to 3,000 fentanyl pills."  PSR ¶ 35, at 9.  He appears to be a drug dealer, giving no

employment information aside from "report[ing] his usual occupation as a landscaping worker."

PSR ¶ 50, at 12.   Released after his arrest, Barba-Villegas allegedly reoffended almost

immediately, when ten days later, on April 6, 2023, he forced police into a dangerous, high-speed

car chase:

> [P]olice attempted a traffic stop on the defendant; however, he began running red
> lights and was driving recklessly. The defendant's driving caused another vehicle
> to collide with a curb as it was forced off the road. The defendant nearly collided
> with several other vehicles as well. The defendant then drove into oncoming traffic.
> The vehicle then crashed into a dirt lot, but then continued to flee from police at a
> high rate of speed. . . . Police [later] located and arrested the defendant. The
> defendant admitted to police he was driver and had used marijuana and fentanyl
> prior to driving . . . .

PSR ¶ 36, at 10.  Not every illegal reentry defendant brought to the United States as a child is

deserving of a cultural assimilation downward departure, particularly those, who like Barba-

Villegas, never "assimilate[d] well to the laws of the United States."  United States v. Lujan-Lopez,

616 F. App'x at 883.  Accordingly, although the departure is authorized, the Court will decline to

grant it.

    For the same reasons that the Court will not depart downward on the basis of Barba-

Villegas' cultural assimilation, it also will not grant him a variance.  Courts are authorized, indeed

required, to consider a defendant's cultural assimilation under the heading of history and

characteristics that § 3553(a) requires district courts to consider when sentencing defendants.  See

United States v. Velasco-Mares, 2021 WL 5895132, at *1 n.1 ("'Cultural assimilation' refers to a defendant's cultural and familial ties to the United States, which are considered among a defendant's history and characteristics under 18 U.S.C. § 3553(a)(1).")(citing United States v. Galarza-Payan, 441 F.3d at 889). The same considerations that counsel against a downward departure -- Barba-Villegas' criminal history and criminal conduct upon illegally reentering the country -- also counsel against a variance. Cf. United States v. Soto-Lopez, 513 F. App'x 746, 750-51 (10th Cir. 2013)(affirming district court's refusal to grant larger cultural assimilation variance where "Mr. Soto-Lopez committed a multitude of crimes over many years, including one as serious as burglary of a dwelling").

The Court does not deem appropriate Application Note 8's cultural assimilation principle. Accordingly, it also will not depart or vary because of Barba-Villegas' family ties to the United States. Like other defendants whom the Court has sentenced for illegal reentry violations, Barba-Villegas' "circumstances [do not] take him outside of the heartland of cases that this Court, this District, the border districts, and the federal courts in general see on a regular basis." United States v. Ledezma-Ledezma, 808 F. Supp. 2d 1301, 1303 (D.N.M. 2011)(Browning, J.).

In sum, the Court denies Barba-Villegas' request for a downward departure. While a departure for cultural assimilation is certainly authorized, the Court concludes that the case's circumstances counsel that a departure is not warranted. The Court is having trouble squaring Barba-Villegas' assertion of cultural assimilation with his long and troubling criminal record. Unfortunately, our prisons contain many people who are in the country illegally and have a lengthy criminal record. The Court sees no way of distinguishing this case from many others it and other federal courts see. This case fits into the heartland of cases the federal courts see. In any case, the Court chooses not to depart because the Court concludes that a departure is not warranted under

the facts and circumstances here.  And even if a departure is warranted under this case's facts, the Court exercises its discretion not to depart because Barba-Villegas' case remains a heartland case.

III.    **THE COURT WILL NOT, ON THE BASIS OF ASSERTED SENTENCING DISPARITIES, DECLINE TO IMPOSE A SENTENCE AT THE HIGH-END OF BARBA-VILLEGAS' SENTENCING RANGE.**

The Court will not sentence Barba-Villegas to a low-end Guideline sentence of 10 months on the basis of data allegedly showing that to do otherwise would introduce "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).   Although the PSR indicates that offense level 10 illegal reentry defendants with category III criminal history typically receive low-end sentences, see PSR ¶ 72, at 15, and Barba-Villegas emphasizes that the most up to date JSIN information demonstrates that such defendants receive below-Guideline sentences, see Sentencing Memo. at 7-8, that data is not comparable to Barba-Villegas' situation.  Although Barba-Villegas is a category III defendant with an offense level of 10, the feature missing from the data -- the issue most concerning to the Court -- is that the defendants in the data are not necessarily ones who, were the Court to impose a low-end Guideline sentence, would be receiving a significantly lower sentence than previously they received for the very same crime.  Nothing indicates the defendants represented in the data share this feature and so are not necessarily "defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

A truly comparative set of data would demonstrate what sentences courts impose on, for example, the following defendants: defendants whose level 10 total offense level is the product of a prior reentry felony but who possess convictions that under the old Guidelines would produce a significant increase, and whose category III criminal history is solely the product of the age of their convictions, not the absence of criminal conduct.  A truly comparative dataset would thus

look to defendants who previously would have received a significant sentence for the same, reentry offense, but now cannot.  The Court suspects that another court, faced with the prospect of imposing a low-end Guideline sentence equivalent to less than half the length of sentence the defendant received previously for the same offense, would be reticent to give such a sentence and would instead impose a sentence at the higher end of the range available to the sentencing court.

As discussed above, this result proceeds from changes to the illegal reentry Guidelines and the older vintage of Barba-Villegas' convictions.  As Barba-Villegas noted at the hearing, that his older juvenile adjudications and adult convictions no longer contribute to his criminal history score reflect a policy choice the Guidelines embody.  See Tr. at 5:2-10 (Harrison); PSR ¶¶ 20-28, at 4-7.  The 2016 changes to the illegal reentry Guidelines that lower Barba-Villegas' offense level relative to his 2014 conviction likewise represent the United States Sentencing Commission's policy choices.  See Amendment 802, U.S. Sent'g Comm'n, https://www.ussc.gov/guidelines/amendment/802 (last visited October 12, 2023).  As with its rejection of the Plea Agreement, the Court does not punish Barba-Villegas, by imposing an upper-end Guideline sentence, because of amendments to the illegal reentry Guidelines that are favorable to him or because of the normal operation of the criminal history Guidelines that diminish the impact of his older conduct.  The Court does not think, however, it serves § 3553(a)'s penological goals that Barba-Villegas should receive so much more lenient a sentence now than he received in the past for the same offense, especially given his recent conduct.  Cf. PSR ¶ 35, at 9 (2023 fentanyl arrest); id. ¶ 36, at 9 (2023 aggravated flight arrest).

It is inappropriate, simultaneously, to depart or vary upwards to impose on Barba-Villegas a sentence equal to or greater than the 24-month sentence that Judge Vázquez imposed in 2014. Although the penological goals of adequate deterrence, respect for the law, and just punishment

are undermined when, for a thrice-committed offense, Barba-Villegas receives a lighter sentence, upward departures and variances are rarely appropriate.  Cf. U.S.S.G. § 5K2.0(a)(2)(A)-(B) ("[If circumstances] not adequately . . . [reflected in] guideline range . . . [are] present in the case[,] . . . a departure consistent with 18 U.S.C. § 3553(b) . . . may be warranted . . . [and a] departure may be warranted in the exceptional case in which . . . [circumstances] not identified in the guidelines . . . [are] relevant to determining the appropriate sentence.").  A variance above Barba-Villegas' Guideline range to impose a sentence equaling or exceeding the 24-month Judge Vázquez imposed in 2014 is "greater than necessary" to achieving 18 U.S.C. § 3553(a)(2)'s purposes.  Although the sentence is not reasonable solely because it is within the Guidelines, cf. Gall v. United States, 552 U.S. at 50-51 (explaining that a sentencing judge "may not presume that the Guidelines range is reasonable"), any less than a high-end, 16-month sentence would not be "a sentence sufficient" to achieve the statute's purposes that Barba-Villegas' punishment "reflect the seriousness of the offense, . . . promote respect for the law, . . . provide just punishment for the offense[, and] . . . afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(A)-(B).

In the sum, the Court has considered the Guidelines, but in arriving at its sentence, has taken a count not only of the Guidelines, but also other sentencing goals.  Specifically, the Court has considered the Guidelines' sentencing range established for the applicable category of offense, committed by the applicable category of defendant.  As stated above, the Court concludes that the punishment set forth in the Guideline range is appropriate for this sort of offense.  While the Court has considered carefully Barba-Villegas' request for a sentence at the low end of the Guideline range, the Court concludes that a sentence at the higher end of the range --16 months -- is adequate, but necessary, to reflect the seriousness of the offense, promote respect for the law, provide just

punishment, afford adequate deterrence both at a specific and general level, and protect the public. Cf. United States v. Rosales-Gonzales, 801 F.3d at 1184 (affirming upper end Guideline sentence to "deter future criminal activity" when defendant had multiple illegal reentry convictions). Because the sentence is a Guideline sentence, it goes a long way to avoiding unwarranted sentencing disparities among defendants with similar records, who have been found guilty of similar conduct. Because the Court anticipates that Barba-Villegas will be deported, it will not impose supervised release. In sum, the Court concludes that a sentence at the high end of the range -- 16 months -- fully and adequately reflects each of the factors that 18 U.S.C. § 3553(a) embodies. See United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir.2007)("[A] district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." (quoting United States v. Wilms, 495 F.3d 277, 280 (6th Cir. 2007)). The Court also concludes that the sentence is reasonable and that it is sufficient, but not greater than necessary, to comply with the purposes of punishment set forth in the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987.

IT IS ORDERED that: (i) the Fast Track Plea Agreement, filed May 24, 2023 (Doc. 19), is rejected; (ii) the Court will not depart or vary downward on the basis of Barba-Villegas' cultural assimilation; (iii) the Court will not impose a low-end Guideline sentence on the basis of asserted sentencing disparities; and (iv) Barba-Villegas is sentenced to 16 months' imprisonment.

_____
UNITED STATES DISTRICT JUDGE

- 44 -

*Counsel:*

Alex M. M. Uballez
  United States Attorney
Rumaldo R. Armijo
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Elizabeth Harrison
Kennedy, Hernandez & Harrison, P.C.
Albuquerque, New Mexico

      *Attorneys for the Defendant*